# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

WAYNE WILLIS,                )
                           )

    **Plaintiff,**            )
                           )

    **v.**                      )          **Case No. 18-cv-617-RJD**
                           )

WEXFORD HEALTH SOURCES, INC., )
RYAN SUTTERER, GAIL WALLS, and, )
MOHAMMED SIDDIQUI,         )
                           )

    **Defendants.**         )

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

The matter is before the Court on the Motions for Summary Judgment (Docs. 61, 70) filed by Defendants. Plaintiff filed a combined response (Doc. 73). Defendants Siddiqui, Sutterer, and Wexford filed a Reply (Doc. 77). For the following reasons, Defendants' motions are **GRANTED**.

## BACKGROUND

Plaintiff Wayne Willis, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated while he was incarcerated at Menard Correctional Center ("Menard"). Following threshold review, Plaintiff proceeds on the following claim:

> **Count 1:** **Defendants exhibited deliberate indifference to Plaintiff's serious medical condition (Type 2 diabetes and associated vision loss/pain), in violation of the Eighth Amendment.**

Plaintiff was incarcerated at Menard from January 2008 to April 26, 2018 (Plaintiff's Deposition, Doc. 62-1 at 12). Plaintiff was diagnosed with Type 2 diabetes in 2012 or 2013 (Id. at 13). Plaintiff is prescribed Metformin to treat his diabetes (Id. at 22). After being diagnosed

with diabetes, Plaintiff was enrolled in a chronic care clinic for diabetes (Id. at 18). Plaintiff testified that he was not regularly seen in the chronic care clinic during 2016 and 2017 (Id.). Plaintiff alleges he was deprived of laboratory testing and chronic clinic visits from April 2016 through July 2017 and that he sustained injury to his eyes as a result (Id. at 25).

During 2016 and 2017, Plaintiff's blood sugar level was tested every Tuesday morning (Id. at 20, Doc. 62-2 at 75-76, 121-122). Plaintiff does not recall a time during 2016 or 2017 when his blood sugar level was particularly high or particularly low so that he required immediate treatment (Id.). In addition to the weekly blood sugar tests, Plaintiff had various lab tests done on April 15, 2016, July 19, 2016, and July 28, 2017 (Dox. 62-2 at 206, 219, 263). Between April 2016 and July 2017, Plaintiff was seen at the healthcare unit more than 20 times for conditions unrelated to his diabetes (Doc. 62-2 at 186 – 261). Plaintiff testified at one point in 2017 he did not receive his Metformin refill to treat his diabetes (Doc. 62-1 at 22). Plaintiff could not recall when he did not receive the refill or the length of time he went without the refill (Id. at 22-24).

On April 16, 2016, Plaintiff signed a Medical Services Refusal for nurse sick call (Doc. 62-2 at 29). Plaintiff testified he refused the appointment because he had been called for labs the previous day and knew it was a mistake (Doc. 62-1 at 26). On August 6, 2016, Plaintiff was issued a call pass to see a physician assistant and the medical records document that Plaintiff needed to be rescheduled because of refusal (Doc. 62-2 at 35). Plaintiff testified he refused the appointment because he did not know why Nurse Practitioner Moldenhauer issued the pass (Doc. 62-1 at 27). Plaintiff thought Moldenhauer was "like a weirdo or something" (Id.). Additionally, Plaintiff testified "I wasn't having any complaints" (Id.). Moldenhauer was involved in chronic care clinics and Plaintiff saw him once or twice (Id.). Plaintiff does not know if the August 6,

2016 pass was issued for chronic clinic testing because he did not attend the appointment (Id. at 26). On September 27, 2016, Plaintiff signed a Medical Services Refusal for a scheduled nurse sick call (Doc. 62-2 at 36). Plaintiff testified he refused treatment on that date for the same reason as the previous refusal (Doc. 62-1 at 27). An entry dated September 30, 2016, signed by M. Moldenhauer notes Plaintiff was scheduled for DMCC ("diabetic mellitus chronic clinic") and refused to attend (Doc. 62-2 at 247). Additionally, Plaintiff's medical records indicate Plaintiff was scheduled for nurse practitioner chronic care for diabetes mellitus on December 17, 2016 and was not seen because he was at yard (Id.). A note in Plaintiff's medical records dated December 30, 2016, indicates Plaintiff also refused a pass to see the physician assistant on that date (Id. at 38, 247). Plaintiff testified he again refused the pass to see Moldenhauer because he did not know why he was being called to see him, but he knew it was not for labs because the lab technicians draw the blood for labs, not doctors (Doc. 62-1 at 27). Plaintiff testified Moldenhauer is gay and, while he is not homophobic, he did not want to be called to an appointment with Moldenhauer when there was no reason for him to be seen (Id. at 28). Plaintiff testified Moldenhauer did not violate his constitutional rights in any way (Id. at 28).

Dr. Siddiqui is a licensed Medical Doctor and has been employed as the Medical Director at Menard since June 12, 2017 (Doc. 62-3 at 4). On July 27, 2017, Plaintiff had an appointment with Dr. Siddiqui for renewal of his medical permits for his knee, elbow, and back braces (Doc. 62-2 at 261). Plaintiff informed Dr. Siddiqui, for the first time, that he had not had laboratory work since April 2016, and Siddiqui ordered laboratory work which was performed the following day (Id. at 263, Doc. 62-1 at 119-120). Plaintiff also informed Siddiqui he had vision loss and asked to be put in to see the eye doctor (Doc. 62-1 at 68). Plaintiff testified he had put in requests

to see the eye doctor prior to seeing Siddiqui as well (Id. at 70). Plaintiff was scheduled to see the optometrist on September 15, 2017 (Doc. 62-2 at 268).

Dr. Sutterer is a licensed optometrist and has been employed by Wexford at Menard since April 29, 2016 (Doc. 62-5 at 4). Plaintiff was scheduled to see Dr. Sutterer on September 15, 2017, but his appointment was rescheduled due to a security lockdown (Doc. 62-2 at 268). Sutterer testified he did not know how rescheduling is done when a lockdown occurs because the medical records department handles the rescheduling of such appointments (Doc. 62-5 at 17). Plaintiff was rescheduled and was seen by Dr. Sutterer on October 10, 2017 (Doc. 62-2 at 62, 269). Sutterer documented Plaintiff's complaint of left "gray" eye, inquired into his medical history and last glucose reading for diabetes, examined Plaintiff with a slit lamp (showing normal corneas, conjunctiva, irises, anterior chambers, lids, and lashes), and ordered that Plaintiff be scheduled to return to the eye clinic so Dr. Sutterer could perform another examination after dilating Plaintiff's eye (Doc. 62-2 at 62, Doc. 62-5 at 18-20).

The purpose of dilating the pupil is to "get a better view and a more complete view of the posterior segment of their eye, the back of their eye, the optic nerve, the retina, so forth" (Doc. 62-5 at 13-14). Patients with diabetes can develop vision issues in the back of the eye, including diabetic retinopathy (hemorrhages in the back of the eye) or macular edema (fluid accumulation in the back of the eye) (Id. at 12). Similarly, if there is a question whether the patient could be developing cataracts, an examination after dilation is needed (Id. at 20).

On November 6, 2017, Plaintiff saw Sutterer again (Doc. 62-2 at 63). Sutterer documented that Plaintiff said his left eye became mildly blurry and gray in June 2017 (Id.). Plaintiff's uncorrected vision was 20/20 in his right eye and 20/50 in his left eye (Id.). Sutterer

dilated Plaintiff's eyes and examined them, noting the start of cataracts, a normal optical nerve/disc, normal blood vessels, normal vitreous, normal cup to disc ratio, and no definitive abnormalities to the macula (Id., Doc. 62-5 at 23-25). Sutterer assessed that Plaintiff was a non-insulin dependent diabetic mellitus patient without retinopathy (no hemorrhaging or bleeding) (Doc. 62-2 at 63). Sutterer wrote a medical furlough to have Plaintiff seen at an outside practice "out of an abundance of caution" (Doc. 62-5 at 25). The referral was approved by Wexford through the Collegial Review process (Doc. 62-2 at 276).

Doctors at Menard have no control over when outside providers are available to schedule and see offenders (Doc. 62-3 at 19). On January 29, 2018, Plaintiff was seen by Dr. Mark Yates at Quantum Vision Centers (Doc. 62-2 at 295). Plaintiff's vision was tested, and he had 20/20 vision in his right eye and 20/25 -1 vision in his left eye (Id. at 296). Plaintiff did not require corrective lenses but could use over-the-counter glasses for near vision use (Id.). Dr. Yates observed no signs of diabetic retinopathy (Id. at 295). Yates assessed that Plaintiff had mild nuclear sclerotic cataracts in both eyes that only needed to be monitored (Id.). Yates diagnosed Plaintiff with Age Related Macular Degeneration ("ARMD") and prescribed Preservision, a vitamin designed to slow the progression of the aging process (Id. at 296). Yates suggested a follow up with a retinal specialist (Id.).

When Plaintiff returned to Menard, Sutterer ordered Preservision, the vitamins that Yates recommended (Doc. 62-1 at 131). Sutterer also put in a request for a follow-up with a retinal specialist and Wexford approved Plaintiff to see another specialist (Doc. 62-2 at 281, 299).

On March 12, 2018, Plaintiff saw retinal specialist, Dr. Akduman (Doc. 62-6 at 19). Dr. Akduman assessed Plaintiff's eyes, including through dilation and an examination with the slit

lamp (Id. at 17). Akduman also performed an optical coherence tomography test and found normal maculas and no diabetic retinopathy (Id. at 17-18). Plaintiff's vision was 20/20 in both eyes (Id. at 16). Akduman diagnosed Plaintiff with cataracts and "ischemic optic neuropathy" (Id. at 14). Akduman recommended a one-year follow up (Id. at 15).

Gail Walls was the Health Care Unit Administrator ("HCUA") at Menard from July 2014 to October 2018 (Doc. 70-1 at 1). As HCUA, Ms. Walls generally oversaw the daily operations on the health care unit and provided responses to offender grievances and letters (Doc. 70-2 at 5). Walls had authority to place an inmate on a schedule to be seen by prison medical staff, but no authority over treatment including determining whether Plaintiff should be referred to a specialist or whether to order medical tests (Doc. 70-1 at 4). Walls had no role in ensuring offenders were seen by outside medical providers or following up on reviewing any care offenders received by outside medical providers (Doc. 70-2 at 11-12). Offenders at Menard can access healthcare services by telling any staff member in the event of an emergency, stopping one of the nurses who walk through the cell houses multiple times a day, or by placing a sheet of paper in the sick call box stating the reasons for needing services (Id. at 8). Prioritization of need for offenders' requests to be seen by the on-site optometrist at Menard were determined by the optometrist (Doc. 70-2 at 9-10).

Menard has chronic clinics for hypertension, seizures, asthma, HIV, hepatitis, diabetes, and general medicine (Doc. 70-2 at 11). Offenders on the diabetic chronic clinic are to be seen every four months based on guidelines from the Office of Health Services (Id. at 8). Laboratory work is to be done prior to the clinic (Id.). At the beginning of each month, the chronic clinic nurse inputs all the people that are to be seen that month and then the scheduler uses that information to

schedule inmates on the lines (Id. at 9).

Plaintiff claims that on September 11, 2017, he stopped Ms. Walls in front of the North 2 Cell House and told her that his vision was blurred and gray-toned, that he had a headache, and that he attributed this to not having his blood drawn (Doc. 62-1 at 101-103). Plaintiff also alleges Walls ignored his grievance seeking medical care (Id.). Plaintiff claims Ms. Walls caused him harm by delaying and denying Plaintiff treatment (Id. at 157). Plaintiff claims Ms. Walls denied him access to a nurse, doctor, practitioner, eye doctor, and off-site medical treatment by not recommending these things (Id. at 158). Plaintiff testified that no medical professional has ever told him his vision would be different if he was seen by medical professionals sooner (Id. at 162).

## LEGAL STANDARD

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital,*

*Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

The Eighth Amendment protects inmates from cruel and unusual punishment. U.S. Const., amend. VIII; see also *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010). As the Supreme Court has recognized, "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, the plaintiff must first show that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

The following circumstances are indicative of an objectively serious condition: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); see also *Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

An inmate must also show that prison officials acted with a sufficiently culpable state of mind, namely deliberate indifference. Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the

defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes*, 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id*. at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Also, "mere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996).

In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer "verifying medical evidence" that the delay (rather than the inmate's underlying condition) caused some degree of harm. *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007).

ANALYSIS

Plaintiff alleges that because there was a one-year gap in his diabetes laboratory tests, he sustained injury to his eye. Defendants argue Plaintiff has produced no evidence that he had complications of his Type 2 diabetes. Defendants further argue Plaintiff has no evidence he has experienced vision loss or pain, much less that it was associated with diabetes. Plaintiff argues diabetes is a serious medical need and his eye problems are a serious medical need, irrespective of whether they are connected to his diabetes.

Plaintiff's claim is that his treatment of diabetes and eye problems was delayed, not that it was never diagnosed or treated. "[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v. Peters*, 100 F.3d 1235,

1240 (7th Cir. 1996). Here, Plaintiff has failed to do so. While there is evidence in the record Plaintiff has been diagnosed with cataracts and ischemic optic neuropathy, there is no evidence to establish the delay in running laboratory tests for Plaintiff's diabetes, or scheduling Plaintiff for an appointment with an eye specialist, caused or exacerbated these eye conditions. Plaintiff has been seen by two eye specialists and the only recommended treatment has been over-the-counter vitamins and continual monitoring of the conditions. Plaintiff's claim fails because he has failed to establish any delay in treatment of his diabetes or eye conditions caused him any degree of harm.

Moreover, Plaintiff's assertions of deliberate indifference by Defendants are not supported by the record in this case. Plaintiff alleges Dr. Siddiqui, as Medical Director, acted with deliberate indifference by failing to ensure Plaintiff was seen in the diabetic chronic clinic every four months as recommended by the guidelines. This claim fails for several reasons. First, the Court notes a failure to follow internal procedures does not mean a constitutional violation has occurred. Additionally, there is no evidence in the record to establish Dr. Siddiqui was personally responsible for the alleged failure to schedule Plaintiff's chronic care clinic appointments. In fact, the record shows Plaintiff was scheduled for chronic care clinic appointments during the July 2016 to July 2017 timeframe and he refused to attend those appointments on at least two occasions in September 2016 and December 2016. Also, Dr. Siddiqui did not become the Medical Director at Menard until June 12, 2017. Dr. Siddiqui first saw Plaintiff on July 27, 2017 and ordered laboratory testing for his diabetes the following day. To the extent Plaintiff's claim asserts Dr. Siddiqui is responsible in his role as Medical Director for alleged delay in treatment by non-parties, *respondeat superior* liability does not apply to prison officials or to a private corporation under § 1983. Dr. Siddiqui is entitled to summary judgment on Plaintiff's claims.

Plaintiff alleges Dr. Sutterer acted with deliberate indifference by failing to schedule Plaintiff to be seen before October 10, 2017. Plaintiff alleges he put in requests to see an eye doctor before July 2017 and Dr. Sutterer did not see him until October 2017, and then did not properly examine him. Plaintiff alleges Sutterer waited until a later appointment on November 6, 2017, to dilate his eyes and fully examine them. Defendant Sutterer argues once Plaintiff requested to be seen he was scheduled and that the cancellation of his first appointment was due to a security lockdown outside his control. Sutterer further argues Plaintiff has provided no evidence he should have been seen earlier. Sutterer contends he did not see any condition that warranted more frequent appointments, nor did the two treating specialists. In fact, the retinal eye specialist did not need to see Plaintiff again in follow up for a year.

Even with the four-month delay, Plaintiff's claim of deliberate indifference against Sutterer fails. As set forth above, Plaintiff's allegations of delay must be supported by evidence that the delay caused some harm and they are not. Defendant Sutterer treated Plaintiff and referred him to two eye specialists for further evaluation. There is no evidence any delay in seeing Sutterer, or the other eye specialists, caused any harm to Plaintiff. Defendant Sutterer is entitled to summary judgment.

Plaintiff's deliberate indifference claim against Defendant Wexford is premised on its alleged failure to maintain adequate staffing of the medical department at Menard. When a private corporation has contracted to provide essential government services, such as health care for inmates, the corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields*, 746 F.3d at 789; *see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

Accordingly, in order for Plaintiff to recover from Wexford, he must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *Id.* at 796. He must also offer evidence showing that the policymakers were aware of the risk created by the custom or practice and failed to take appropriate steps to protect him. *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).

Defendant Wexford contends it is entitled to summary judgment because Plaintiff has failed to show that any delay in seeing a specialist or receiving treatment caused him any injury. Wexford contends Plaintiff was approved to see an eye specialist both times it was recommended, and the specialists informed Plaintiff he had aging eyes and recommended vitamins. Plaintiff argues there were well-documented staffing deficiencies at Menard and that Wexford's corporate representative acknowledged staffing deficiencies resulted in backlogs for inmates waiting to be treated. Plaintiff contends his inability to receive lab tests for his diabetes for a year, or to receive diagnosis and treatment of his eye problems for months, were a result of Wexford's failure to maintain adequate staffing.

As set forth above, Plaintiff has failed to submit any evidence a delay in receiving treatment caused him any injury. Additionally, Plaintiff has provided no evidence that any lack of care for his diabetes was due to staffing deficiencies. In fact, medical providers scheduled Plaintiff for multiple appointments for treatment of his diabetes that he subsequently refused to attend. Regarding treatment of his eyes, it is unclear exactly when Plaintiff first requested an appointment. Even assuming Plaintiff waited four months as alleged, there is no evidence the delay caused him any injury.

Plaintiff alleges Defendant Gail Walls was deliberately indifferent by failing to properly respond to a February 17, 2017 grievance complaining about a lack of lab tests, headaches, and blurred vision. Plaintiff alleges Walls was responsible for addressing grievances and that by failing to schedule Plaintiff for his diabetes lab tests she acted with deliberate indifference. Defendant Walls argues she was not responsible for any missed chronic clinics or delays in seeing the optometrist. Walls also argues Plaintiff cannot show he was harmed by any delay he attributes to Walls and that she is entitled to qualified immunity.

Plaintiff has failed to set forth any evidence Defendant Walls was personally responsible for Plaintiff being scheduled for his chronic diabetes clinic. At most, Plaintiff alleges Walls was negligent in responding to a grievance and negligence is not enough to state a claim of deliberate indifference. To the extent Plaintiff alleges a claim against Walls for her supervisory role as the Health Care Unit Administrator, it is well settled law that *respondeat superior* is not a viable claim under deliberate indifference. Additionally, as previously explained, Plaintiff has failed to set forth any verifying medical evidence that the alleged delay by Walls caused him harm. Defendant Walls is entitled to summary judgment.

## CONCLUSION

Based on the foregoing, the Motions for Summary Judgment filed by Defendants (Doc. 61, 70) are **GRANTED**. The Clerk shall enter judgment in favor of Defendants Siddiqui, Sutterer, Walls, and Wexford and against Plaintiff. The Clerk of Court is **DIRECTED** to enter judgment accordingly and to close the case.

**IT IS SO ORDERED.**

DATED:   February 18, 2020

_s/ Reona J. Daly_
**Hon. Reona J. Daly**
**United States Magistrate Judge**